UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SHERYL L. ASTOLOS, [1]

                              Plaintiff,

          v.

MICHAEL J. ASTRUE, [2]
Commissioner of Social Security

                              Defendant.

_____

                              **REPORT
                              and
                              RECOMMENDATION**

                              **06-CV-0678A(F)**

APPEARANCES:      LAW OFFICES OF KENNETH HILLER
                  Attorneys for Plaintiff
                  JOSEPH D. CLARK, of Counsel
                  6000 North Bailey Avenue
                  Suite 1A
                  Amherst, New York 14226

                  TERRANCE P. FLYNN
                  United States Attorney
                  Attorney for Defendant
                  JANE B. WOLFE
                  Assistant United States Attorney, of Counsel
                  Federal Centre
                  138 Delaware Avenue
                  Buffalo, New York 14202

_____

[1] Plaintiff, in the heading of the Complaint, is referred to as "Sheryl L. Astolos."  Doc. No. 1 at 1. However, in the body of the Complaint and in every other document filed with the court this action, Plaintiff is referred to as "Sheryl L. Astalos."  Although such fact indicates a possible question as to the correct spelling of Plaintiff's name, the court takes no position on the matter.

[2] On February 12, 2007, Michael J. Astrue became Commissioner of Social Security and, pursuant to Fed.R.Civ.P. 25 (d)(1), is substituted for Jo Anne B. Barnhart as the defendant in this action. No further action is required to continue this suit.  42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office").

## JURISDICTION

This action was referred to the undersigned by the Honorable Richard J. Arcara on April 11, 2007.  The matter is presently before the court on motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, filed by both Defendant and Plaintiff on March 6, 2007.  (Doc. Nos. 5 and 7, respectively).

## BACKGROUND

Plaintiff Sheryl L. Astolos seeks review of Defendant's decision denying her Social Security Disability Insurance benefits ("SSDI") under Title II of the Social Security Act ("the Act").  In denying Plaintiff's application for disability benefits, Defendant determined that although Plaintiff has not, since August 4, 2004, performed substantial gainful activity and suffers from a degenerative disease of the lumbar spine, carpal tunnel syndrome and degenerative joint disease of the hands, Plaintiff's impairments are severe but do not meet or equal the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4, Sections 1.02, 1.04 and 11.14 of the Act.  (R. 24.) [3] Defendant also found that Plaintiff, while unable to perform her past relevant work, can perform other work "available in significant numbers in the regional and national economies." (R. 14, 24-25.)   As such, Plaintiff was found not disabled, as defined in the Social Security Act, since the alleged onset date of her disability.  (R. 24).

Plaintiff filed an application for a period of disability and disability insurance benefits on February 15, 2004, and which was denied on November 26, 2004.  (R. 14). Pursuant to Plaintiff's request, an administrative hearing was held before Administrative

---

[3] "R." references are to pages in the Administrative Record.

Law Judge Alan J. Sacks  ("the ALJ") on November 2, 2005, at which time Plaintiff appeared and testified.  (R. 14, 20, 25).  The decision became the final decision of the Commissioner when the Appeals Council, on September 14, 2006,  denied Plaintiff's request for review, dated December 5, 2005.  (R. 3-4).  This action followed with Plaintiff's filing of the Complaint on October 12, 2006.  (Doc. No. 1).

Defendant's Answer to the Complaint, filed December 29, 2006 (Doc. No. 3), was accompanied by the record of administrative proceedings.  On March 6, 2007, Defendant filed a Motion for Judgment on the Pleadings (Doc. No. 5) ("Defendant's Motion") and a Memorandum of Law (Doc. No. 6) ("Defendant's Memorandum") in support of Defendant's Motion.  Plaintiff, also on March 6, 2007, filed a Motion for Judgment on the Pleadings (Doc. No. 7) ("Plaintiff's Motion").  Plaintiff filed a Reply Memorandum of Law (Doc. No. 11) ("Plaintiff's Reply") on April 20, 2007.

Based on the following, Defendant's motion should be GRANTED; Plaintiff's motion should be DENIED.

## **FACTS**

Plaintiff, Sheryl L. Astolos, born July 21, 1953, has a high school education and worked as a bank investigator from 1989-1994, and from 1994 to 2004 for the United States Postal Service ("Postal Service"), at the Buffalo Post Office, earning $21 an hour as a Mail Processor when she allegedly became disabled on February 1, 2004[4] and subsequently stopped working on August 4, 2004.  (R. 23, 32, 36, 65-66, 74, 78, 204).

---

[4] Although Plaintiff asserts she became disabled on February 1, 2004, elsewhere in the record, Plaintiff represented that she became disabled on January 1, 2004.  ( R. 14).

Plaintiff claims she could not work because of a back injury, carpel tunnel in her left wrist, spinal stenosis, arthritis, high blood pressure and a pinched nerve in the neck.  (R. 73, 74).

While working full-time, Plaintiff requested but was denied light duty work, Plaintiff worked 30 hours a week, supplementing the remainder of her time each week pursuant to the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA"), with FMLA leave, from January 2004 until August 2004, when her disability retirement from the Postal Service was approved.[5]  (R. 204).  Plaintiff is currently unemployed.  (R. 52-53, 65, 74, 204-05).

While employed with the Postal Service, Plaintiff injured her right index finger on a mail bin on October 20, 1997.  (R. 186, 192).  Thereafter, a magnetic resonance image ("MRI") taken of Plaintiff's spine on June 1, 1998 revealed that Plaintiff suffered from "advanced collapse of the L5-S1 disc space" in her back. [6, 7, 8] (R. 189).  On March 5, 1999, Emoke Gomez, M.D. ("Dr. Gomez") diagnosed Plaintiff as suffering from

---

[5] Family leave may be taken intermittently, "in separate blocks of time due to a single qualifying reason," such as a chronic serious health condition which causes the employee to be "unable to perform the essential functions of the position."  29 C.F.R. § 825.203(a), (c)(1).

[6] L5-S1 is the point at which the lumbar spine meets the sacrum, commonly referred to as the Lumbosacral Joint.  The Lumbosacral Joint or L5-S1, *available at*: http://.backandneck.about.com/od/anatomyexplained/ss/L5S1.htm.

[7] The lumbar spine is made up of 5 vertebrae which comprise the lower back.  Lumbar Spine - What is the Lumbar Spine?, *available at:* http://backandneck.about.com/od/l/g/lumbar.htm.

[8] The sacrum is "a triangular bone located at the bottom of the spine" which stabilizes the pelvis. Sacrum - Sacral, *available at:* http://backandneck.about.com/od/s/g/sacrumsacral.htm.

"active psoriatic arthritis [9] involving her shoulders, knees, feet and hands."  (R. 193).  An

MRI of Plaintiff's lumbar spine, performed April 19, 2002, revealed scoliosis [10] with mild

degenerative disc disease [11] at L4-5 [12] and moderate Degenerative Disc Disease at L5-

S1.  (R. 17, 194).

On February 2, 2004, Neurology and Electromyography specialist George C.

Kalonaros, M.D. ("Dr. Kalonaros"), examined Plaintiff and found "right median

neuropathy, [13] localized to the wrist."  (R. 90).  Plaintiff visited Edgardo Salvador, M.D.

("Dr. Salvador") several times in 2004, complaining of neck and hand pain, nausea and

diarrhea in April 2004, and in June 2004, reported a decrease in neck and left arm pain.

(R. 95, 97).  At Plaintiff's next visit with Dr. Salvador on July 30, 2004, Plaintiff stated

that her neck and back pain had not improved, but her stomach problems had. (R. 94).

---

[9] Psoriatic arthritis is "a chronic disease characterized by inflammation of the skin (psoriasis) and joints (arthritis)," characterized by "patchy, raised red areas of skin." Psoriatic Arthritis, *available at*: http://www.medicinenet.com/psoriatic_arthritis/article.htm.

[10] Scoliosis is a lateral curvature of the spine.  Definition of Scoliosis, *available at*: http://www.medicinenet.com/script/main/art.asp?articlekey=5421.

[11] Degenerative Disc Disease refers to changes in the individual discs of the spine, most commonly in the lumbar (lower back) and cervical (neck) spine regions.   Definition of Degenerative Disc Disease, *available at:* http://www.healthscout.com/ency/68/627/main.html#DefinitionofDegenerativeDiscDisease.

[12] L4-5 is a space between discs L4 and L5 in the lumbar spine (lower back).  Multilevel spinal fusion for lumbar degenerative disc disease, *available at* http://www.spine-health.com/treatment/spinal-fusion/multilevel-spinal-fusion-lumbar-degenerative-disc-disease.

[13] Neuropathy is a disorder affecting peripheral nerves, the nerves that "connect the spinal cord to muscles, skin and internal organs," which can cause "numbness, tingling and pain."   ABOUT PERIPHERAL NEUROPATHY: FACTS, *available at* http://www.neuropathy.org/site/PageServer?pagename=About_Facts.

During that visit, Plaintiff presented Phalen's and Tinel's signs [14] on her right wrist.  *Id*.

Plaintiff was referred by the Division of Disability Determination to Richard Eales, M.D. ("Dr. Eales"), an internal medicine specialist, for consultative examination.  (R. 107).  Upon examination on October 11, 2004, Dr. Eales found Plaintiff in "no acute distress," and exhibited normal "station and gait."  (R. 110).  Dr. Eales observed that Plaintiff could heel/toe walk, perform a 3/4's squat, rise from a chair, change clothes and get on and off the examination table without difficulty.  *Id*.  A lumbosacral spine X-ray revealed moderate degenerative disc disease at Plaintiff's L5-S1 and scoliosis as well as "slight narrowing of disc space L2-3."  (R. 112).  Dr. Eales noted a bony increase in Plaintiff's hands, characteristic of degenerative joint disease.  *Id*.  Upon examination of the cervical spine, no spasm or significant abnormalities were observed, however, Plaintiff reported some tenderness at C6-7.  (R. 111).  Plaintiff could perform a 45° flexion and extension, rotation to 80° bilaterally, and lateral flexion to 30° bilaterally,[15] but complained of posterior pain upon full 45° extension and pulling on the sides with bilateral rotation and lateral flexion.  *Id.* Plaintiff displayed full range of motion in shoulders, elbows, wrists, hips and ankles bilaterally, and straight leg raise was negative.  *Id*.  No significant soft tissue swelling, redness, warmth, joint effusions,[16]

---

[14] Phalen's and Tinel's sign tests are used to diagnose carpal tunnel syndrome.  Physical exam for carpal tunnel syndrome, *available at* http://webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome.

[15] Normal ranges of motion for the cervical spine are 0 to 45° forward flexion, 0 to 45° extension,  0 to 45° left lateral flexion, 0 to 45° right lateral flexion, 0 to 80° left lateral rotation, 0 to 80° right lateral rotation.  Disability Examination Worksheets - Spine Examination, *available at* http://www.vba.va.gov/bin/21/Benefits/exams/disexm53.htm.

[16] An effusion is fluid which escapes from the blood vessels into tissues or cavities.  Effusion, *available at* http://medical-dictionary.thefreedictionary.com/effusion.

crepitus,[17] subluxations,[18] contractures,[19] ankylosis,[20] or thickening were present upon examination.  *Id.* Some flexion deformities of the toes at the PIP location [21] were observed, and early hammer toe deformities were noted in Plaintiff's great toes.  (R. 112).  There was no evidence of active inflammatory arthritis, cyanosis, [22] clubbing [23] or edema,[24] and tenderness was insignificant.  Dr. Eales diagnosed Plaintiff with chronic low back pain; arthralgias [25] of the neck, hands, feet and knees, with a history of psoriatic arthritis, hypertension, and gastroesophageal reflux disease.  (R. 112).  Plaintiff reported she also suffered from bilateral carpal tunnel syndrome and

---

[17] Crepitus describes the grating sound produced by bone fragments that rub together from fractured bone.  Crepitus, *available at* http://medical-dictionary.thefreedictionary.com/crepitus.   Unless otherwise stated, all medical term definitions are to http://medical-dictionary.thefreedictionary.com.

[18] Subluxation refers to partial joint dislocation.

[19] A contracture is a tightening of the muscle.

[20] Ankylosis is "stiffening or immobility of a joint resulting from disease, trauma, surgery or bone fusion."

[21] PIP stands for proximal interphalangeal joint, which, in the toe, refers to the middle toe joint, Toe Joint Deformities, *available at* http://health.yahoo.com/other-other/toe-joint-deformities/healthwise-hw143095.html, and on the hand, is the joint closest to the knuckle on each finger which separates the two phalanges of the finger also closest to the knuckle.  PIP Joint Injuries of the Finger, *available at* http://www.eorthopod.com/public/patient_education/6566/pip_joint_injuries_of_the_finger.html.

[22] Cyanosis is "a physical sign causing bluish discoloration of the skin and mucous membranes" caused by "lack of oxygen in the blood."

[23] Clubbing is "[a] condition affecting the fingers and toes in which the extremities are broadened and the nails are shiny and abnormally curved."

[24] Edema is the term describing excess serous fluid in connective tissue(s) or serous cavities.  Edema, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

[25] Arthralgia is "pain in one or more joints."  Arthralgia, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

depression. [26]  *Id.*  Some tenderness over Plaintiff's distal cervical spine was observed

upon examination, however, Plaintiff's range of motion was "full and comfortable."  (R.

113).  Dr. Eales concluded that (1) Plaintiff's prognosis was good; (2) Plaintiff's

complaints of pain are intermittent; (3) Plaintiff's activities were slightly diminished; (4)

Plaintiff may have mild limitations to general activity; and (5) Plaintiff should avoid

excessive bending and lifting.  (R. 113).

On November 2, 2004, the Office of Disability Determination ("Disability Office")

referred Plaintiff to Thomas Dickinson, Ph. D. ("Dr. Dickinson"), for psychiatric

examination.  Upon review, Dr. Dickinson noted Plaintiff's longitudinal history included

no psychiatric hospitalizations or personal counseling, except for one marriage

counseling session after a divorce.  (R. 116).  Dr. Dickinson noted Plaintiff reported

suffering from hypertension, psoriatic arthritis, spinal stenosis, herniated back disc,

carpal tunnel syndrome, menopause, poor sleep, pain and fatigue, and observed

Plaintiff exhibited normal gait, posture and motor behavior.  (R. 117, 120).  Plaintiff, who

reported taking daily medications including one 40 mg tablet of Protonix, one 10 mg of

Ambien, two 1mg tablets of folic acid, one 200 mg tablet of Celebrex, one 300 mg tablet

of diltiazem, one 10 mg tablet of lisinopril, one 150 mg tablet of Effexor, and 2.5 mg of

methotrexate [27] six times a week, Embrel twice a week, as well as Lipitor, a blood

pressure pill, and a water pill.  (R. 116, 224).  Plaintiff told Dr. Dickinson she did not

---

[26] Plaintiff became "tearful" when questioned about her depression, but maintained this did not usually occur outside of such medical examinations.  (R. 112).

[27] Methotrexate is a drug used to treat cancer and autoimmune diseases such as psoriatic arthritis and rheumatoid arthritis.  Methotrexate, *available at* http://en.wikipedia.org/wiki/Methotrexate.

8

think she required counseling, but complained of restless sleep and of suffering from pain while sleeping.  (R. 116).  Plaintiff reported sleeping two to three hours only without her medication, and six or seven hours when taking her medication.  (R. 117).

Plaintiff denied having a temper, being impatient, forgetful, suspicious, compulsive, or that she suffered from panic attacks, mood swings, thought disorder, social fears, or had difficulty concentrating or remembering, or being withdrawn.  *Id.* Plaintiff stated she had common sense, could handle a checkbook, budget her money, could learn new things and pay attention.  *Id.*  Plaintiff denied suffering from nightmares or exhibiting behavior such as nail biting*.  Id.* Plaintiff smoked from age 16 to 22, and is a social drinker.  *Id.* Dr. Dickinson diagnosed Plaintiff with mild adjustment disorder with depression, but noted Plaintiff displayed average intelligence "with college reading skill," fair insight and judgment, full and appropriate affect, coherent, fluent, and adequately expressive.  (R. 117-18).  Dr. Dickinson found Plaintiff to be "pleasant and cooperative," but determined that "complex tasks and distractions" might be "mildly difficult" for Plaintiff.  (R. 119).  Accordingly, Dr. Dickinson determined Plaintiff could perform repetitious tasks with mild supervision.  *Id.*

On November 18, 2004, the Disability Office's physician George Burnett ("Dr. Burnett") evaluated Plaintiff's physical and mental residual functional capacities, and found Plaintiff was not at all restricted in performing daily living activities, maintaining concentration, persistence or pace, and Plaintiff did not display episodes of deterioration.  (R. 141).  Dr. Burnett noted Plaintiff had mild difficulty with maintaining social functioning, *id.*, and was moderately limited in her ability to set realistic goals or make plans "independently of others."  (R. 128).  An upper gastro-intestinal endoscopy

performed on April 14, 2005, revealed Plaintiff suffered from hiatus hernia, and anti-reflux medications were recommended.  (R. 164).  Doctor's notes, dated April 18, 2005, indicated Plaintiff's hypertension was "well-controlled."

Plaintiff testified while working as a Postal Service employee, she began experiencing pain in her hands in January of 2004.  (R. 212). In addition to a joint deformity in the first finger on Plaintiff's right hand, Plaintiff claimed she suffered from loss of use of a tendon in that area of her hand. [28] (R. 215).  In both the Function Report Plaintiff submitted to the Disability Office and at the administrative hearing held April 3, 2002, Plaintiff stated she prepared meals, shopped and performed light housework. (R. 26-58).  Plaintiff stated that she discontinued skiing and bowling because of back problems, and that her husband does the laundry, washes the kitchen and bathroom floors and tub.  (R. 57, 207).  Plaintiff testified that she is able to wash dishes, make the bed, vacuum, dust, sweep and mop, however, according to Plaintiff, she cannot do yard work, shovel, or take out the trash.  (R. 207-08).  Plaintiff also stated she could lift bags of groceries, a gallon of water or milk, and a container of laundry soap.  (R. 209). Plaintiff stated she could lift an item weighing twice as much (as a full laundry soap bottle) using two hands, but testified that it would be painful.  *Id.*  Plaintiff testified that Effexor controlled her depressive symptoms, and admitted her disability is essentially limited to her physical condition, characterized by pain in her left shoulder, neck, hands, feet, toes, knees and back.  (R. 213).  Plaintiff experiences pain in these areas every

---

[28] When asked by the ALJ if "that twist in that last part of your finger affect[s] how you can use your hand," Plaintiff stated "it's numb 'cause I – the tendon is gone in here."  (R. 214) (bracketed material added).  There was no medical record before the ALJ which could confirm Plaintiff's representation of the loss of a tendon in the first finger of Plaintiff's right hand.  (R. 215).

day, and takes Tylenol 500 with codeine to reduce the pain.  (R. 215).

Plaintiff testified before the administrative law judge ("ALJ") that she can stand for 15 to 20 minutes before having to sit, sit for approximately 1 hour before having to stand, that she has trouble bending, crouching, and reaching over her head with her left arm.  (R. 211).  In particular, the deformity in Plaintiff's toes is associated with arthritis which, according to Plaintiff, is "crippling 'em up," and the first finger on Plaintiff's right hand is bent at the tip.  (R. 214).  Plaintiff also testified she did not believe that she could perform her previous job as a bank investigator because, according to Plaintiff, she would have difficulty filing and typing.  (R. 219, 221).  Plaintiff opined she could not work an eight-hour a day, five-day a week job because she "get[s] very . . . tired and . . . sleep[s] a lot at home."  (R. 219-20) (bracketed material added).

James Phillips ("Phillips") testified at Plaintiff's administrative hearing as a vocational expert.  (R. 23, 226).  Phillips classified Plaintiff's previous job as an investigator as "sedentary, skilled work with transferable skills to other sedentary work," and Plaintiff's former mail clerk job as "medium, semi-skilled work without transferable skills."  (R. 23, 226-27).  In response to a hypothetical posed by the ALJ of an individual of the same age and education as Plaintiff, who was capable of a full range of light work, Phillips opined that such individual would be able to perform the investigator work previously performed by Plaintiff.  (R. 228).  The ALJ found Plaintiff's prior jobs were past relevant work based on Phillips' determination that Plaintiff performed these jobs long enough to "learn and perform it at an average level for the relevant industry."  (R. 23).  The ALJ determined, based on the earnings record, that these jobs were at the level of "substantial gainful activity."  *Id.*

11

In response to a second hypothetical posed by the ALJ, Phillips stated that a person with Plaintiff's limitations could not perform Plaintiff's past jobs.  (R. 23, 229). The ALJ concluded, "based on the testimony and documentary evidence of record," that Plaintiff could not perform past relevant work.  *Id.*  Phillips opined that someone with Plaintiff's residual functional capacity, age, education and work experience could perform other sedentary jobs, including that of telephone operator.  (R. 24, 229-30).

---

## DISCUSSION

**1.     Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).  Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2nd Cir. 1980).

A.      **Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402

U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a

reasonable person would "accept as adequate to support a conclusion."  *Consol. Edison*

*Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, he must consider "objective

medical facts, diagnoses or medical opinions based on these facts, subjective evidence

of pain or disability (testified to by the claimant and others), and . . . educational

background, age and work experience."  *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d

Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of

the treating physician is supported by medically acceptable techniques and results from

frequent examinations, and the opinion supports the administrative record, the treating

physician's opinion will be given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567

(2d Cir. 1993); 20 C.F.R. §§ 404.1527(d), 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is

supported by substantial evidence.  *Dumas, supra*, at 1550; 42 U.S.C. §§  405(g) and

1383(c)(3).  "Congress has instructed . . . that the factual findings of the Secretary,[29] if

_____

[29] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the
function of the Secretary of Health and Human Services in Social Security cases was transferred to the
Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, the
Commissioner of Social Security has been substituted for the Secretary of Health and Human Services as
the defendant in this action.

supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685

F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

The federal regulations set forth a five-step analysis that the Commissioner must

follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520

and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v.

Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the

applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b) and

416.920(b).  If the individual is engaged in such activity the inquiry ceases and the

individual cannot be eligible for disability benefits.  *Id.*  The next step is to determine

whether the applicant has a severe impairment which significantly limits his physical or

mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§

404.1520(c) and 416.920(c).  Absent an impairment, the applicant is not eligible for

disability benefits.  *Id.*  Third, if there is an impairment and the impairment, or an

equivalent, is listed in Appendix 1 of the regulations and meets the duration

requirement, the individual is deemed disabled, regardless of the applicant's age,

education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a

case, there is a presumption that an applicant with such an impairment is unable to

perform substantial gainful activity.[30]  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A);

20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2

(S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in

---

[30] The applicant must meet the duration requirement which mandates that the impairment must last for
at least a twelve month period.  20 C.F.R. §§  404.1509 and 416.909.

Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the applicant can still perform work he has done in the past, the applicant will be denied disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also Berry, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work").  If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits.  *Id.*  The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment.  *Berry, supra*, at 467.  In reviewing the administrative finding, the court must follow this five-step analysis to determine if there was substantial evidence on which the Commissioner based her decision.  *Richardson*, 402 U.S. at 410 (1971).

**B.    Substantial Gainful Activity**

The first inquiry is to determine whether the applicant is engaged in substantial gainful activity.  "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties and is done for pay or profit."  20 C.F.R. §§  404.1510 and 416.910.

In this case, the ALJ concluded that Plaintiff had not engaged in substantial

gainful activity since August 4, 2004.  (R. 24).  This finding is undisputed.

C.    <u>Severe Physical or Mental Impairment</u>

The next step of the analysis is to determine whether Plaintiff had a severe physical or mental impairment significantly limiting her ability to do "basic work activities."  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

The ALJ concluded that Plaintiff had severe impairments consisting of degenerative disc disease of the lumbar spine, carpal tunnel syndrome and degenerative joint disease of the hands.  (R. 24).  The ALJ then continued on to the next step, a finding of whether Plaintiff's impairments were severe enough to constitute an impairment as set forth in the Listing of Impairments, Appendix 1, 20 C.F.R. Pt. 404, Subpt. P, Regulation No. 4, Sections 1.02, 1.04 and 11.14.

**D.** **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments
are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P.  If the
impairments are listed in the Appendix, they are considered severe enough to prevent
an individual from performing any gainful activity.  20 C.F.R. §§ 404.1525(a),
416.920(a)(4)(iii) and 416.920(d).  In the instant case, although the ALJ determined that
Plaintiff has degenerative disease of the lumbar spine, carpal tunnel syndrome and
degenerative joint disease of the hands, which interfere with her ability to work and
therefore are, within the meaning of the regulations, severe, Plaintiff's condition was not
so severe as to meet the criteria of any impairment or combination of impairments set
forth in the Listing of Impairments.  (R. 19-20).  Substantial evidence in the record
supports this finding.

The relevant listing impairments in Plaintiff's case are 20 C.F.R. Pt. 404, Subpt.
P, App. 1, §§ 1.02 ("§ 1.02") ("Major dysfunction of a joint(s) (due to any cause)"), 1.04
("§ 1.04") ("Disorders of the spine") and 11.14 ("§ 11.14") ("Peripheral neuropathies").

To be disabled within the meaning of § 1.02, a person's joint dysfunction must be

> Characterized by gross anatomical deformity (e.g., subluxation,
> contracture, bony or fibrous ankylosis, instability) and chronic joint
> pain and stiffness with signs of limitation of motion or other
> abnormal motion of the affected joint(s), and findings on
> appropriate medically acceptable imaging of joint space narrowing,
> bony destruction, or ankylosis of the affected joints(s).  With:
>
> A.   Involvement of one major peripheral weight-bearing joint
>      (i.e., hip, knee, or ankle), resulting in inability to ambulate
>      effectively, as defined in 1.00B2b;
>
>      or

17

> B.    Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

§ 1.02.

As noted in 20 C.F.R., Pt. 404. Subpt. P, App. 1, § 1.00(B)(2)(c), inability to perform gross movements effectively include may include

> the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R., Pt. 404. Subpt. P, App. 1, § 1.00(B)(2)(c); *Gladden v. Comm'r of Soc. Sec.*, 536 F.Supp.2d 403, 419 (S.D.N.Y. 2008).

In the instant case, although Plaintiff was found by Dr. Kalonaros to suffer from a right median neuropathy, localized to the wrist, and carpal tunnel on the left side (R. 90), Plaintiff is able to maintain her personal hygiene and prepare meals.  (R. 57, 60 109, 208).  Plaintiff testified that she has trouble bending and crouching, and claimed she would have trouble filing what was required of her in her former job as bank investigator, particularly with lower files (R. 211, 218), but was observed by Dr. Eales to successfully squat three-fourths down and did not require assistance getting on or off the exam table and chair.  (R. 210).  Significantly, Plaintiff did not assert, as required by § 1.00(B)(2)(c) to constitute an inability to perform gross movements, that Plaintiff could not place files in a drawer "at or above waist level."   Plaintiff's gait and ability to ambulate were normal, and Plaintiff was observed to heel-tow walk without difficulty.  (R. 110).  Thus, there was substantial evidence in the record on which to find Plaintiff performed gross movements effectively.

Aside from Plaintiff's ability to perform gross movements, substantial evidence in the record supports the ALJ's finding that Plaintiff's joint dysfunctions do not meet the criteria of § 1.02.  (R. 18, 24-25).  Significantly, whereas "gross anatomical deformity" in § 1.02 may include, for example, deformities equivalent in severity to "subluxation, contracture, bony or fibrous ankylosis and instability," upon examination by Dr. Eales on October 11, 2004, subluxations, contractures and ankylosis were ruled out as diagnoses of Plaintiff's ailments.  (R. 110-11).  Further, although medical evidence establishes Plaintiff suffered from a bony increase of her hands (R. 112), there is no evidence establishing Plaintiff suffered from chronic joint pain and stiffness, and no diagnostic image findings of joint space narrowing.  (R. 18).

Under § 1.04 of the Listing of Impairments, disorders of the spine, a person may be disabled if medical evidence demonstrates herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root or the spinal cord, and accompanied by one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or

19

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00(B)(2)(b).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 ("§ 1.04").

As stated by the ALJ, and pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B) ("§ 1.00(B)"), a spinal disorder is not an impairment within the meaning of §1.04 "unless it results on a sustained basis in functional loss defined as the inability to ambulate effectively or perform fine and gross movements effectively."  (R. 18). Ineffective ambulation may include inability to

1)    Walk without use of a walker, two crutches, or canes;
2)    Walk one block at a reasonable pace on rough or uneven surfaces;
3)    Use public transportation;
4)    Carry out routine ambulatory activities, such as shopping or banking; and
5)    Climb a few steps at a reasonable pace with the use of a hand rail.

(R. 19).

As a threshold matter, Plaintiff has not claimed, nor does evidence in the record establish that Plaintiff was unable to perform any or all activities listed in numbers 1-5 above.  In addition, although diagnostic testing revealed moderate to severe degenerative disc disease of the lumbar spine, no nerve involvement, as required by § 1.04, was present. [31]  Plaintiff's straight leg test was negative. (R. 111).  Thus, Defendant's decision to deny disability benefits was based on substantial evidence relative to plaintiff's spinal and joint complaints.

---

[31] Clinical tests since the alleged onset date have revealed no nerve involvement.

Substantial evidence in the record also supports the ALJ's determination that Plaintiff is not disabled by peripheral neuropathies.  (R. 19-20).  In particular, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14 (1999) provides for disability when peripheral neuropathies are accompanied by "disorganization of motor function as described in 11.04B, in spite of the prescribed treatment," and § 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04B.  Persistent disorganization of motor function is defined in § 11.00C as "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances . . . .The assessment of impairment depends on the degree of interference with . . . use of fingers, hands and arms."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C.

Here, the ALJ found that, although the EMG indicated neuropathy in one wrist, there was no evidence Plaintiff suffered from disorganization of motor function in two extremities, as required by §11.04B, or that Plaintiff was diagnosed with "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances." (R. 19).  Further, Plaintiff could use her hands for routine activities and demonstrated normal station and gait.  *Id.*

As such, the ALJ's determination that Plaintiff's impairments did not, either singly or in combination, meet or equal the severity of any listed impairment is supported by the record.  (R. 20); *Koseck v. Sec'y of Health and Human Servs.*, 865 F.Supp. 1000, 1010 (W.D.N.Y. 1994) (ALJ required to address multiple impairments, both severe and non-severe, in combination and consider their cumulative effect on determining whether

21

a claimant is disabled).  The court next considers whether substantial evidence in the record supports the ALJ's determination that Plaintiff retained the residual functional capacity for her prior work.

## E.    "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in this five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work.  "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity.  *Cosme v. Bowen, 1986 WL 12118,* at *3 (S.D.N.Y. 1986).

The ALJ found that Plaintiff was unable to perform her past relevant work experience as an investigator and mail clerk because of physical limitations.  (R. 23). This finding is undisputed.

## F.    Suitable Alternative Employment in the National Economy

As the ALJ concluded that Plaintiff was unable to perform her past relevant work, the ALJ went on to make a determination as to whether there was any position within the national economy for which Plaintiff would be qualified or suitable.  Because of the ALJ's finding that Plaintiff's impairments prevented her from returning to her previous work, the burden shifted to the Commissioner to prove that there was substantial gainful work that Plaintiff could perform in light of her physical capabilities, age, education, experience, and training.  *Parker*, 626 F.2d at 231.  Further, it is the rule in the Second Circuit that "all complaints . . . must be considered together in determining . . . work

capacity." *DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 937 (2d Cir.

1984).  It is improper to determine a claimant's work capacity based solely upon an

evaluation of the severity of the claimant's individual complaints.  *Gold v. Sec'y of*

*Health and Human Servs.*, 463 F.2d 38, 42 (2d Cir. 1972).

To make such a determination, the Commissioner must first show that the

applicant's impairment or impairments are such that they permit certain basic work

activities essential for other employment opportunities.  *Decker v. Harris*, 647 F.2d 291,

294 (2d Cir. 1981).  Specifically, the Commissioner must demonstrate by substantial

evidence the applicant's "residual functional capacity" with regard to the applicant's

strength and "exertional capabilities."  *Decker, supra*, at 294.  An individual's exertional

capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very

heavy" work.[32]  *Id.*  In addition, the Commissioner must prove that the claimant's skills

are transferrable to the new employment, if the claimant was employed in a "semi-

skilled" or "skilled" job.[33]  *Decker, supra*, at 294.  This element is particularly important in

---

[32]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a).

[33]  The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled."  *Decker, supra*, at 295.

"Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).

"Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching

determining the second prong of the test, whether suitable employment exists in the national economy.  *Id.* at 296.

The Second Circuit has directed that where a disability benefits claimant cannot perform the full range of sedentary work, a strict, mechanical application of the grids is improper; rather, the plaintiff must be evaluated on an individual basis, and that such evaluation on an individual basis "can be met *only* by calling a vocational expert to testify as to the plaintiff's ability to perform some particular job."  *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) (italics added) (reversing district court's decision upholding denial of plaintiff's claim for disability benefits and remanding for further evaluation of plaintiff on an individual basis, including testimony by a vocational expert, given that the grids do not apply to claimants who are unable to perform the full range of sedentary work).  Furthermore, following the vocational expert's testimony, the plaintiff must be afforded an opportunity to rebut the expert's evidence. *Id.*

The ALJ, in his decision, acknowledges that because Plaintiff cannot perform a full range of light or sedentary work, the Medical-Vocational rules do not dictate the result.  Consequentially, the ALJ sought Mr. Phillips's expert opinion on whether someone with Plaintiff's vocational profile could work in the national economy and if so, what kind of work could the person perform.  (R. 23-24).  After reviewing Plaintiff's credentials and limitations, Phillips concluded that an individual having Plaintiff's

---

machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

vocational profile could not perform Plaintiff's past jobs, but could perform at the sedentary level with transferable skills.[34] (R. 229).  Significantly, Phillips opined that an individual who could not sit, stand, or walk a total of eight hours per day, for reasons which may include napping during the day, would not be able to engage in substantial employment.  (R. 230).  The validity of the ALJ's finding that Plaintiff is not disabled under the Act rests, in part, upon the ALJ's determination that Plaintiff is less than credible insofar as Plaintiff has alleged the medication she takes for pain causes her to nap during the day, which, under the hypothetical posed to Phillips at the hearing, (R. 228-230), would prevent Plaintiff from engaging in substantial gainful activity.  Had the ALJ found Plaintiff credible, and accepted Plaintiff's claim she was forced to nap during the day as a result of the medications she was taking, based on Phillips's opinion, the ALJ would have found Plaintiff disabled under the Act.  (R. 23-25).

Based on the documentary evidence and testimony of vocational expert Phillips, the ALJ concluded that Plaintiff, who had a twelfth grade education, could not return to her past work (R. 23), but had transferable skills to sedentary occupations including that of telephone solicitor, with 1,800 jobs locally and 173,000 jobs nationally, and quotation clerk, with 434 jobs regionally and 115,000 jobs nationally, as well as the residual functional capacity to lift and carry up to 15 pounds, perform occasional postural activities, and could occasionally lift overhead with left shoulder, and occasionally use her hands. (R. 23-25, 228-230); Defendant's Memorandum at 22.   The ALJ found

---

[34] Phillips testified Plaintiff was incapable of performing the full range of light or sedentary work because she could not lift more than 15 pounds, sit more than 60 minutes continuously, stand or walk for more than 20 minutes at a time, or more than occasionally lift objects overhead, due to left shoulder pain, or use her hands more than occasionally.  (R. 228-230).

Plaintiff is not disabled, as defined by the Social Security Act, in part because Plaintiff continued to work by adjusting her schedule since the alleged onset date of disability, and because Plaintiff could perform some sedentary work.  (R. 23-24).

### 1.  Plaintiff's Credibility

Plaintiff asserts that the ALJ erred, as a matter of law, in finding Plaintiff partially incredible insofar as the ALJ failed to consider Plaintiff's work history.  Plaintiff's Memorandum at 6-7.  Plaintiff also asserts that her performance of daily living activities does not negate a finding that she is disabled because her performance of such activities was not sustained and regular, as required by SSR 96-8p to find Plaintiff is not disabled under the Act.  *Id.* at 8-11.

A plaintiff's subjective complaints alone are insufficient to support a finding of disability, *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (ALJ need not "accept without question the credibility of such subjective evidence"), but must be accorded weight when accompanied by "evidence of an underlying medical condition" and an "objectively determined medical condition [which is] of a severity which can reasonably be expected to give rise to the alleged pain."  *Cameron v. Bowen*, 683 F.Supp. 73, 77 n.4 (S.D.N.Y. 1984).  The ALJ must evaluate plaintiff's credibility regarding the extent of plaintiff's alleged pain based on all of the evidence.  *Marcus*, *supra*, at 27; *Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir. 1983); *Kendall v. Apfel*, 15 F.Supp.2d 262, 267 (E.D.N.Y. 1998).  Such evidence must include "(1) objective medical facts and clinical findings, (2) diagnoses and medical opinions of examining physicians, (3) the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him, and (4) the claimant's age, educational background and work

26

history." *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)

(citing cases).  "When a plaintiff's claims of pain exceed the support provided by

objective medical evidence , the ALJ must examine such factors as the plaintiff's daily

activities." *Speruggia v. Astrue*, 2008 WL 818004, at *11 (E.D.N.Y. 2008) (internal

quotation omitted); *Soto v. Barnhart*, 2002 WL 31729500, at *6 (S.D.N.Y. 2002) (ALJ

required to make credibility finding where plaintiff's subjective testimony "not fully

supported by the available medical evidence.") (citing *Donato v. Sec'y of Health and*

*Human Servs.,* 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, although "ALJs are

specifically instructed that credibility determinations should take account of 'prior work

history,'" and "a good work history may be deemed probative of credibility," *Janas v.*

*Barnhart,* 451 F.Supp.2d 483, 501 (W.D.N.Y. 2006) (citing *Schaal v. Apfel*, 134 F.3d

496, 502 (2d Cir. 1998)); *Rivera*, 717 F.2d at 725 ("A claimant with a good work record

is entitled to substantial credibility when claiming an inability to work because of a

disability.") *see also Koseck v. Sec'y of Health and Human Servs.,* 865 F.Supp.1000,

1014 (W.D.N.Y. 1994) (fact that machinist-plaintiff of twenty-two years worked four

years after the onset of his disability supported plaintiff's credibility) (citing *Felisky v.*

*Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (seventeen year work history supported

plaintiff's credibility); *but see Ditullio v. Village of Massena*, 81 F.Supp.2d 397, 407

(N.D.N.Y. 2000) ("[T]he fact that Plaintiff continues to be employed as a police officer by

Defendant undermines any claim that he is substantially limited in his ability to work"),

work history is just one factor used to assess the credibility of Plaintiff's subjective

complaints. [35]  Here, in reaching his credibility determination, the ALJ relied primarily on

the fact that Plaintiff's complaints of subjective pain are unsupported by the medical

record statements that she must take naps and is unable to work were not corroborated

by the medical record.  The ALJ's credibility finding was based on the (i) the absence of

clinical findings on examination to support Plaintiff's subjective complaints of pain in her

left shoulder, feet, knees, lumbar spine or hands; (ii) Plaintiff's statement to Dr. Eales in

October 2004 that she only felt pain in her lower back when lifting about 40 pounds; (iii)

Plaintiff's allegations that medications she took made her sleepy were not confirmed by

the record; (iv) Plaintiff engaged in activities above the level of limitation alleged; and (v)

Plaintiff obtained relief from pain medication, but took it only occasionally.  (R. 20-21).

Thus, while the ALJ did not specifically allude to Plaintiff's work history as

relevant to his determination of Plaintiff's credibility (R. 20), the ALJ was aware of

Plaintiff's work-record, (R. 23, 50-55, 74, 204, 205), and it is not, therefore, reasonable

to infer that the ALJ completely ignored Plaintiff's work-history in making his credibility

assessment. [36] The ALJ accepted Plaintiff's description of activities and "work-related

limits," because it was supported by the record, but found Plaintiff's statements that she

---

[35] Plaintiff also contends that her credibility was bolstered by the fact that Plaintiff never sought
unemployment benefits.  Plaintiff's Memorandum at 8.  However, such fact is irrelevant to whether a
claimant is entitled to social security benefits based on a disability.

[36] This case is distinguishable from *Wilber v. Astrue*, 2008 WL 850327, at * 3 (W.D.N.Y. 2008),
where the District Judge found the ALJ's credibility finding "legally deficient" based on the ALJ's failure to
consider plaintiff's work history.  There is no indication in *Wilber* that the ALJ relied upon inconsistencies
between plaintiff's testimony and the medical diagnoses and/or opinions of treating physicians in the
medical record to find plaintiff was not credible.  The court's research revealed no case which requires the
court to remand for reconsideration because the ALJ did not discuss plaintiff's work history in his decision
despite the presence of other, substantial evidence in the record sufficient to support a credibility finding,
and Plaintiff points to none.

naps and her opinion that she cannot work not credible because, according to the ALJ, "the record does not support" it. (R. 21).  In particular, the ALJ noted Plaintiff's daily activities, including Plaintiff's ability to groom herself and care for her personal hygiene, watch television, collect figurines, exercise, socialize with friends, eat at restaurants and read, perform light cleaning, shop, visit the library, pay bills, attend movies, talk on the phone, take an annual vacation to Las Vegas, drive, garden and use a computer. (R. 16.).

Plaintiff claims her ability to perform such tasks is not inconsistent with a finding that she is disabled.  Plaintiff's Memorandum at 8.  Specifically, Plaintiff asserts the ALJ did not comply with Social Security Ruling 96-8p ("SSR 96-8p"), requiring the ALJ to discuss Plaintiff's ability to perform "sustained work activities in an ordinary work setting on a regular and continuing basis, and the [residual functional capacity] assessment must include a discussion of the individual's abilities on that basis."  SSR 96-8p; Plaintiff's Memorandum at 9.  "A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p.  The Second Circuit has held that a plaintiff who engages in limited, daily living activities may, nevertheless, be found disabled where there is no evidence that plaintiff could sustain performance of these activities for any period of time on a regular and continuing basis.  *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998) ("[A] claimant need not be an invalid to be found disabled under the Social Security Act.") (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)); *see also Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  In *Balsamo*, the court held because plaintiff did not read, watch television, listen to the radio, or ride buses and subways for any sustained period of

29

time, "comparable to those required to hold a sedentary job," plaintiff's ability to  perform

these activities will not count against plaintiff in finding that plaintiff is disabled.

Likewise, the Second Circuit held that although plaintiff "sometimes read [ ], watch[ed]

television, listen[ed] to the radio, [and rode] buses and subways," because no evidence

established plaintiff could perform such activities "for sustained periods comparable to

those required to hold a sedentary job," the Secretary, "by failing to introduce any

medical or other evidence, such as the testimony of a vocational expert or a consulting

physician," did not establish that plaintiff was not disabled. [37]  *Carroll,* 705 F.2d at 643.

Here, not only did the ALJ rely on the opinion of vocational expert James Phillips, in

determining Plaintiff's ability to work based on her residual functional capacity and

finding, ultimately, that Plaintiff could perform certain sedentary jobs such as quotation

clerk or telephone solicitor, but the record also shows the ALJ considered how Plaintiff's

physical limitations would affect her ability to work on a sustained basis.  (R. 219)

Though not specifically stated as a fact taken into account in his decision, the ALJ did

question Plaintiff about her ability to perform certain aspects of her past work on an

eight-hour a day, full-time (five-day a week) basis.  The discussion is as follows:

> Q.      . . . Now, suppose, suppose it was work as easy as the bank
> investigator work, but without those aspects that you would
> find troublesome so that you wouldn't have to use your
> hands very much.  There wouldn't be filing involved very
> much, just [INAUDIBLE].  Do you think you could do a job

---

[37] Defendant asserts it is significant no medical evidence states Plaintiff is unable to perform all work,  Defendant's Memorandum at 15, however "the mere absence of a conclusory statement that the claimant is "disabled" [does not] create substantial evidence of fitness to work."  *Johnson v. Apfel*, 1998 WL 372406, at * 7 (E.D.N.Y. 1998).  In other words, "the Commissioner cannot deny benefits simply because the doctor did not utter the words 'disabled' or 'unable to work.'"  *Id.*  Therefore, Plaintiff may be considered disabled under the Act even when plaintiff's physicians have not definitively labeled plaintiff as such.  (R. 21); Defendant's Memorandum at 16.

like that?

A.   It depends on how many hours it would be –

Q.   Eight hours a day, full-time.  Five days a week.

A.   –I don't know.  I get very – I get very tired and I sleep a lot at home. . .

Q.   Okay.  Now, if that job I mentioned to you might be too hard for you now, do you think you could've done it at the time when you left your old work at the post office?

A.   Yeah, well, yes, I did.  I applied for part-time work, but they didn't have anything available.

Q.   I'm talking about full-time work . . .

In this case, Plaintiff told Dr. Eales she does much of the cleaning, including dusting and vacuuming.  (R. 109).  Plaintiff also reported shopping, doing limited chores outside, including gardening and weeding, climbing and descending stairs to her basement, driving, walking around stores, using a computer, and participating in water aerobics and running.  (R. 110).  Plaintiff handled her personal needs without assistance (R. 109), occasionally went to dinner, to a casino, or for a ride in her boat.  (R. 109).  Based on Plaintiff's statements to Dr. Eales regarding her ability to perform such activities, Plaintiff's statements at the hearing before the ALJ regarding her ability to perform certain activities on a full-time, continuing basis, and the ALJ's reliance on the opinion of vocational expert Phillips and Plaintiff's description of her ability to engage in and sustain such activities, the court finds the ALJ adequately considered Plaintiff's ability to perform such activities on a continued basis when rendering his decision.  Furthermore, the ALJ did discuss Plaintiff's ability to perform sustained work activities in

his decision.  Specifically, the ALJ stated

> . . . the claimant performed full-time medium work until August, 2004, and the record does not establish a marked decline in her condition since then; no evidence confirms that the claimant requires frequent naps; she takes pain medication only occasionally; and she engages in many routine physical activities.

(R. 23).

### 2.    ALJ's Failure to Develop the Record

Plaintiff also contends that the ALJ failed to fully develop the record by not seeking documentation confirming carpal tunnel in Plaintiff's left wrist, the loss of a tendon in the first finger on her right hand, and a 12-year old MRI of Plaintiff's back. Plaintiff's Memorandum at 11 (citing R. 215-217).  The court does not agree.

The ALJ has an affirmative duty to develop the record.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)  It is evident, based on the transcript from the administrative hearing, that the ALJ believed having these medical records at his disposal would assist him in making his disability determination.  (R. 215-216).  However, at the close of the hearing, Plaintiff's attorney stated he would try to obtain the additional medical records at issue, and the ALJ granted the attorney an additional two weeks in which to obtain and provide the documents.  (R. 230).  In his decision issued on December 29, 2005, the ALJ confirmed that he held the record open for two weeks after the hearing which took place on November 2, 2005 for counsel to submit additional documentation regarding Plaintiff's physical condition, but counsel for Plaintiff and Defendant failed to do so.  (R. 14).  Thus, the ALJ did not fail to develop the record; rather, Plaintiff failed to supplement the record despite having a reasonable opportunity to do so.  The most

likely explanation for this failure is that the MRI could not be located or that Plaintiff

concluded it was not helpful to her claim.  Plaintiff does not contend otherwise.

## **CONCLUSION**

Based on the foregoing, Defendant's Motion (Doc. No. 5) should be GRANTED;

and Plaintiff's Motion (Doc. No. 7) should be DENIED.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 22, 2008
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      July 22, 2008
            Buffalo, New York